1    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

2                        NORTHERN DIVISION

3    ────────────────────────────────────────────────────────────

4    WILLIAM GRANT KOLKOW AND
     LINDA R. KOLKOW,                    CASE NO. 1:11-CV-118

5               PLAINTIFFS,

6       v.

7
     BANK OF AMERICA, N.A.; BAC
8    HOME LOANS SERVICING,LP;
     RECONTRUST COMPANY,NA;              SALT LAKE CITY, UTAH
9    FEDERAL NATIONAL MORTGAGE           DECEMBER 20, 2012
     ASSOCIATION; MORTGAGE
10   ELECTRONIC REGISTRATION SYSTEMS
     INC.; AND DOES 1 THROUGH 10,

11
               DEFENDANTS.
12

13   ────────────────────────────────────────────────────────────

       DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
14            BEFORE THE HONORABLE ROBERT J. SHELBY
                UNITED STATES DISTRICT COURT JUDGE
15

     APPEARANCES:
16

     FOR THE PLAINTIFFS:
17                              MORSE & MORSE
                                BY:  DANIEL J. MORSE, ESQ.
18                              6078 SHADYCREEK DRIVE
                                AGOURA HILLS, CALIFORNIA 91301
19                              (865) 524-2569

20   FOR THE DEFENDANTS:
                                ACKERMAN SENTERFITT LLP
21                              BY:  CHANDLER P. THOMPSON, ESQ.
                                170 SOUTH MAIN STREET, SUITE 950
22                              SALT LAKE CITY, UTAH 84101
                                (801) 907-6900
23

     COURT REPORTER:
24                              RAYMOND P. FENLON
                                351 SOUTH WEST TEMPLE, #7.430
25                              SALT LAKE CITY, UTAH 84101
                                (801) 809-4634

1                    P-R-O-C-E-E-D-I-N-G-S

2                         (3:36 PM)

3          THE COURT:  Good afternoon.  We will go on the

4     record in case number 1:11-CV-118.  Counsel, why don't you go

5     ahead and state your appearances, if you would, please.

6          MR. THOMPSON:  Chandler Thompson for the

7     Defendants.

8          THE COURT:  Good afternoon.

9          MR. MORSE:  And I'm Daniel Morse for the Kolkows.

10         THE COURT:  Good afternoon, welcome, both of you.

11    Thank you.  This is the time set for hearing on the

12    Defendants' motion to dismiss.

13         I think, Mr. Morse, I have a question for you first out

14    of the gates.  The Defendants submitted some supplemental

15    authority, the RM Lifestyles decision from the Utah Court of

16    Appeals relating to the quiet title claim.  We didn't receive

17    a response from the Plaintiffs, of course you are not required

18    to submit one.  I guess I'm wondering whether in your view

19    that case is dispositive of the quiet title claim.

20         MR. MORSE:  No, certainly not.  I think Babcock is

21    controlling.

22         THE COURT:  Okay.  So it's the Defendants' motion.

23    Mr. Thompson, I'll go ahead and invite you to take the first

24    run at it.

25         MR. THOMPSON:  Thank you, Your Honor.  This

1  litigation relates to a mortgage loan that was originated in

2  2004.  According to the facts as alleged in the complaint, the

3  Plaintiffs experienced hardship in 2008 when they were not

4  living in the property, and our records confirm that the first

5  default did occur in that year.

6      As of July of 2009, the loan was still in default but the

7  parties entered into a forbearance agreement dated July 19th,

8  2009, which is attached as Exhibit 3 to our motion.  The

9  forbearance agreement provides that in exchange for six months

10  of reduced payments, BAC Home Loan Servicing would suspend

11  foreclosure activities.  And there is no allegation in this

12  case that any Defendant breached any of the terms of that

13  agreement.

14      The agreement specifically provides that at the

15  termination of the agreement, any foreclosure proceedings that

16  have been suspended may resume.  And also I should apologize

17  for my voice.  I've been a little under the weather.  My voice

18  usually sounds annoying to me on tape but today it sounds

19  annoying just as I stand here.

20      The COURT:   No problem.  Thank you.

21      MR. THOMPSON:  The forbearance agreement further

22  provides that it's not a loan modification, and upon

23  termination the servicer can modify the loan, require

24  Plaintiffs to reinstate the loan, or foreclose.

25      Plaintiff alleges that at the conclusion of the

1    forbearance period they were told that they prequalified for a

2    HAMP modification, but they could only qualify if they -- the

3    property was their principal residence.  They allege then that

4    they moved from Arizona to Utah in July of 2010.

5    Interestingly, in the forbearance agreement they represent

6    that it is their principal residence.  And that was in July of

7    2009.

8         Plaintiffs allege that after moving back to Utah 2010,

9    July, BAC promised to send them a HAMP modification

10   application package and that they got that application package

11   in September.  They then allege that they returned all the

12   documents, they submitted all the requested information, and

13   that the modification was denied in April of 2011 based on the

14   net present value test.

15        As far as the foreclosure activity, ReconTrust was

16   substituted as the trustee under the deed of trust in October

17   2010.  They recorded a notice of default at that time, and the

18   property was sold at a foreclosure sale on May 3rd, 2011, and

19   the Plaintiffs still are in possession of the property.

20        They assert six causes of action:  Breach of contract,

21   which according to the complaint includes breach of the loan

22   contract and breach of the Servicer Participation Agreement

23   related to BAC's or Bank of America's participation in the

24   HAMP program, to which they claim to be an intended

25   third-party beneficiary.

1        The second claim is for negligence by allegedly failing

2   to properly process their modification application.

3        Third is quiet title based on ReconTrust's alleged lack

4   of authority to exercise the power of sale.

5        Fourth is emotional distress based on the denial of the

6   loan modification following their move from Arizona back to

7   Utah.

8        The fifth is promissory estoppel based on the alleged

9   statement that they prequalified for a HAMP modification.

10       The final cause of action is declaratory judgment that

11  ReconTrust lacked authority to exercise the power of sale,

12  that the sale is void, and that the trustee's deed in favor of

13  Fannie Mae is also void.

14       I'd like to address the easier claims first and put the

15  ReconTrust claim, which includes declaratory judgment and

16  quiet title, to the back.  That's the more complicated claim

17  that also involves an appeal to the Tenth Circuit and a split

18  in authority on -- amongst the federal -- Utah federal

19  judiciary.

20       So going back to breach of contract, as we indicate in

21  our motion to dismiss, Plaintiff cannot state a claim for

22  breach of contract.  First of all, the law is very clear that

23  you cannot state -- there is no private right of action under

24  HAMP, and that borrowers are not intended third-party

25  beneficiaries under servicer participation agreements.  There

1    just is no authority whatsoever to support that claim.

2        Second, there's no contractual right in any of the loan

3    documents to any kind of a modification or modification

4    process, and thus Defendants' alleged mishandling of the

5    modification process or handling it not to Plaintiffs' liking,

6    cannot state a claim for breach of contract.

7        And, third, even if there were contractual rights to some

8    kind of modification process, Plaintiffs' breach of the loan

9    agreement two years before the modification process got going

10   would doom that claim.

11       THE COURT:  Well, the parties could agree orally to

12   modify their arrangement.

13       MR. THOMPSON:  Well, that would be -- that would

14   create an issue under the statute of frauds because it's

15   either a credit agreement or an agreement relating to

16   property, and any -- the modification of any agreement that's

17   subject to the statute of frauds is also subject to the

18   statute of frauds.

19       THE COURT:  Well, except that there are exceptions

20   for that, right?  I mean some of those are noted by Judge

21   Stewart I think in one of his decisions in the last year or

22   two dealing with an issue like this.

23       MR. THOMPSON:  Well, there are some exceptions, but

24   like, for example, promissory estoppel, if there is no -- if

25   there's no reasonable explanation for the actions that

1    occurred other than there being a promise.  There are very

2    strict standards for getting around the statute of frauds.  If

3    we're talking about a modification to a written contract

4    subject to the statute of frauds and the Court would like more

5    briefing on that issue, I'd be happy to do it.  I addressed

6    those issues in several cases, but the bottom line is it is a

7    very stringent standard to get around the statute of frauds.

8              THE COURT:  All right.  I agree with that.

9              MR. THOMPSON:  They also make a claim within their

10   contract claim for breach of the covenant of good faith and

11   fair dealing, but establishing such a claim would require the

12   contract to be written, create rights that aren't contained in

13   the contract, and where there is no breach of a contractual

14   provision, there cannot be a claim for the covenant of good

15   faith and fair dealing.

16       Now, addressing Plaintiffs' arguments about breach of

17   contract in the opposition --

18              THE COURT:  So if we find that the parties orally

19   modified their agreement, then does that give rise to a duty

20   on behalf of the banks to conduct themselves in accordance

21   with good faith and fair dealing?

22              MR. THOMPSON:  I would say yes, that if there is a

23   valid modification, even if the -- the deed of trust says it

24   has to be and the note modified in writing only.

25       Addressing Plaintiffs' arguments, the Stanton case, which

1    goes to the good faith and fair dealing, is a Judge Kimball

2    case, is clearly distinguishable.  That case involved a

3    promise to forbear from foreclosure while the modification was

4    in process, which was breached.  And the way that it was

5    breached prevented the Plaintiffs from taking steps to protect

6    their interests, and that upset the expectations of the

7    parties.

8            THE COURT:  Isn't that also possibly the case here?

9    I mean the Plaintiffs don't talk about this in the complaint

10   or in the briefing, but, for example, if we get into the

11   requirement that the -- that the Plaintiffs object to the sale

12   in advance of the trustee sale for example --

13           MR. THOMPSON:  Or show prejudice.

14           THE COURT:  Sure.  The bank foreclosed 13 days

15   earlier than they told the Plaintiffs they would, right?  Does

16   that impact their ability to raise those objections in a

17   timely manner?

18           MR. THOMPSON:  Well, I'm not sure exactly how they

19   were told that it was 13 days later than it actually was.

20           The Court:  Well, in the letters, in the

21   correspondence that you submitted, but it came with the

22   briefing.

23           MR. THOMPSON:  Right.  But there isn't -- I mean

24   there's no claim in this case that if we had those 13 days X

25   would have happened.

1          THE COURT:  I agree.

2          MR. THOMPSON:  And in this case, going to the

3    Stanton case, the parties clearly complied with the

4    forbearance.  There was no foreclosure during the modification

5    process.  It was not until the modification was denied that

6    the foreclosure actually happened.  And the rights related to

7    the forbearance were clearly -- they clearly obtained every

8    benefit of those rights.

9          They also attempt to alter their claim somewhat in their

10   opposition on the -- on the breach of contract claims in two

11   ways.  They argue that the deed of trust is governed by Utah

12   law and that -- and that therefore ReconTrust breached that

13   agreement by exercising the power of sale in contravention of

14   Utah law.

15         I'll discuss the role -- ReconTrust's role later, but,

16   first, the response to both of the new arguments on the breach

17   of contract claim, the second one being that there was an oral

18   modification, the prequalification statement is an oral

19   modification.  First, the memorandum in opposition to a motion

20   to dismiss is not the proper avenue to make that kind of

21   claim.

22         With respect to the contract being governed by Utah and

23   federal law, which the Plaintiff says, that's a matter of --

24   that's not -- that doesn't create substantive rights.  That's

25   a matter of how the Court will interpret the contract.  And

1    the deed of trust does not state, as it could have, and as it

2    did in the 1880 case that they cite on the ReconTrust issue,

3    that only a specific trustee can exercise the power of sale.

4         On the attempt -- on the modification to the written

5    contract, I mean that claim is not in the complaint and so

6    it's difficult for me to address.  It would require, I would

7    think, significant -- what was the agreement?

8              THE COURT:  I agree.  I think -- well, it may be

9    more helpful to hear more from you in rebuttal after we hear

10   from the Plaintiffs on the breach of contract claim, but I

11   understand the arguments that you're making, I understand the

12   briefing, and I've read the cases that relate on that issue.

13             MR. THOMPSON:  Okay.  The bottom line is there isn't

14   a writing that would support any kind of modification to that

15   contract.

16        The negligence claim fails because it is well established

17   in Utah and across the country that lenders and loan servicers

18   in arm's length transactions with borrowers do not owe in

19   negligence a tort duty of care.  The relationship is governed

20   by contract, it's arm's length, and it's adverse.

21             THE COURT:  Actually, I don't mean to cut you off --

22   well, actually I do mean to cut you off.  I'm going to invite

23   you to skip past the negligence too I think until we hear from

24   the Plaintiffs.  I think they may have some work to do on that

25   claim.

1          MR. THOMPSON:  Okay.

2          THE COURT:  Why don't I focus you on, if I can, on

3     the emotional distress claims and the promissory estoppel

4     claim.

5          MR. THOMPSON:  Okay.  Emotional distress, that claim

6     fails for several reasons, the first reason being foreclosure

7     on a deed of trust after admitted default on a note,

8     especially three years -- after three years of trying to work

9     out an arrangement, is not an outrageous act.

10          THE COURT:  Well, that's too narrow though, isn't

11     it?  I mean don't we have to evaluate the Plaintiffs' well

12     pled allegations, including all of the facts and circumstances

13     that they allege are part of this transaction, making repeated

14     representations to the Plaintiffs that they're prequalified,

15     you're prequalified, you just need to move back here, leave

16     your job, get rid of your renters, continue -- I mean this is

17     all part of what needs to be considered, is it not?

18          MR. THOMPSON:  No.  I agree.  But you're

19     prequalified, there was never any -- never alleged any

20     representations here is the modification that you're going to

21     get and here are the terms.  It was you're prequalified to

22     apply for a HAMP modification.  There was never any promise

23     you get a loan modification.

24          THE COURT:  But they don't -- that's not an element

25     of an emotional distress claim, is it?

1          MR. THOMPSON:  No, it isn't, but you're talking

2    about evaluating all of the circumstances trying to determine

3    if there is a sufficiently outrageous act, and merely

4    saying -- I mean the truth is in order to get -- in order to

5    qualify for HAMP it does -- you do -- it does have to be your

6    principal residence, and those are the rules.  And just about

7    every modification process includes a this is your principal

8    residence representation.

9       So there just -- there's nothing here that says if you

10   move -- you've prequalified.  If you move back, we'll give you

11   an application.  You can submit it.  And there's never a

12   representation you're getting a loan modification.  It was

13   their decision to move back several years after they

14   defaulted.

15          THE COURT:  So what does it mean you're

16   prequalified?  What does that mean?

17          MR. THOMPSON:  Well, I'm not sure -- you know, I'm

18   not exactly sure what that means.  I'm not exactly sure that's

19   what was said.  That's what the allegations are.  But what I

20   understand that it means is you fit the criteria in that your

21   loan is for a certain amount.  You are a certain number of

22   months in default, and all the other -- the basic

23   qualifications before you do the net present value test,

24   before you do the -- you analyze their income, and before you

25   analyze their hardship to determine to -- to apply within

1    the -- within the parameters for obtaining that kind of a

2    modification.

3              THE COURT:  Okay.  But that's not what the

4    Plaintiffs state in their complaint, right?  And at this stage

5    on a motion to dismiss, don't I resolve those factual -- am I

6    not required to resolve those factual questions in the

7    Plaintiffs' favor?

8              MR. THOMPSON:  Well, but there isn't any

9    representation.  There isn't any factual allegation other than

10   prequalified.

11             THE COURT:  Right.

12             MR. THOMPSON:  So I mean, yes, I think what I've

13   just explained to you is beyond the complaint, and I'm just

14   trying to explain my understanding, but that doesn't mean that

15   there are -- you know, we can add these kinds of allegations,

16   prequalification meant blank because they don't allege it.

17             THE COURT:  Could a jury find and conclude that it's

18   sufficiently outrageous conduct for a bank in possession of

19   all the relevant information, allegedly, to tell a homeowner

20   that they prequalify for a modification, everything will be

21   fine, just move back, leave your other residence in Arizona,

22   leave your job, kick out your renter who is paying the rent,

23   and do all of this, and then just wait a while after you've

24   already committed and then we'll tell you that we didn't

25   really mean it?  Suppose a jury -- can a jury conclude under

1    those facts and circumstances that this is outrageous conduct

2    from a mortgage lender?

3            MR. THOMPSON:  I don't think so.  I don't think so,

4    not based on the facts that are in this complaint, because

5    there was never any promise here is your modification, here is

6    your terms, you are entitled to this.  And there's no contract

7    right to be entitled to that.  And if merely saying that

8    someone told me that I prequalified for a modification

9    sufficient to get to emotional distress and all of the other

10   potential torts and things along those lines, when the written

11   documents say the exact opposite, there is no right to a

12   modification in any of these written documents, then I think

13   you're opening up a gigantic can of worms in terms of it is

14   going to affect the availability of credit in the mortgage

15   market across the board, or affect the way in which the loan

16   modification process works.

17       I mean if that's all it takes to get to emotional

18   distress, and the Lord knows how much in damages or punitive

19   damages is, well, they told me I prequalified, then, you know,

20   I would advise my client don't consider anyone for a loan

21   modification.  You can't do it because -- send them a letter

22   that says I'm sorry because all they have to say is on the

23   phone some person in the bank said, sure, you prequalify.  And

24   that's a dangerous way to go.

25       The other problem with the emotional distress claim is

1    there isn't any allegations in there about emotional distress.

2    It's just boilerplate emotional -- you know, I suffered

3    emotional distress.  I mean that's basically what the

4    complaint says.

5         And I mean this is not a claim that is -- this is a

6    stringent claim under Utah law, and it's not a claim you can

7    just say I suffered emotional distress and get to a jury.

8         Promissory estoppel.  A claim that we're estopped from

9    foreclosing based on this prequalification statement, that the

10   Defendants are estopped from foreclosure, but they cannot --

11   there's a number of problems with this claim.  First, they

12   cannot show that they detrimentally relied on that statement.

13   They defaulted in 2008.  That triggers the right to foreclose.

14   They -- the statements about prequalification were not

15   allegedly made until 2010.  So there's no detriment related to

16   the foreclosure process that they -- that they could have

17   relied -- that they could have resulted because they relied on

18   a prequalification statement.

19             THE COURT:  I read that argument in your briefing.

20   And let me say that I appreciated your briefing.  I thought it

21   was very helpful.  But on this point I really was lost.  I

22   mean I don't -- maybe I just view the Plaintiffs' claim

23   differently than you do, but I understand it to be a little

24   more simple than I think the Defendants make it out to be in

25   their brief.

1          The essence of the claim as I understand it is the bank

2     made a promise to us.  They offered an inducement, and knowing

3     and intending that we would rely on it.  And the promise in

4     the inducement was you're prequalified, move back to your

5     house, and we did.  And as a result of that -- and the bank

6     had all the facts and circumstances in their -- they knew the

7     facts and circumstances.  We relied and we were harmed.  We

8     left a job.  I don't know what other cash or what other

9     damages they might quantify.  I'm actually a little concerned

10    about that because it's not clear to me what those

11    consequential damages would be.  But just a simple we relied

12    on your representation to our detriment and came back and we

13    have some damages.  I don't interpret their claim to go so far

14    as to say, though Mr. Morse will correct me if I'm wrong, that

15    it unwinds the entire mortgage.

16          MR. THOMPSON:  Oh, no, I don't think he's making

17    that claim either.

18          THE COURT:  So why does the default in 2007 relate

19    in any way to the -- I looked it up just to make sure I was

20    focused on the right term.  I looked again at the case law and

21    the definition of promissory estoppel.  I think it can hang on

22    its own merits, can it not?

23          MR. THOMPSON:  I mean you have to have detrimental

24    reliance.

25          THE COURT:  On what?

16

1          MR. THOMPSON:  Well, in this case it's on the

2     statement that you prequalified.  I mean I think there are

3     other problems with the claim that I'll get to in a minute,

4     but -- and like, for example, I wasn't going to default, and

5     you told me to default in order to obtain this modification.

6     That's an equally dangerous kind of argument, but it's not

7     here because they default two years before that statement.

8          And once that happens, there's no promise from that point

9     forward we're not going to consider you that you're in default

10    and utilize our rights that are -- that we're entitled to upon

11    default.  So there's no detriment from that statement that

12    relates to the foreclosure process.

13         I see your point that you're saying, well, what about the

14    move?  And that is a slightly different issue.  And I think

15    that goes more to some of the -- some of the other elements of

16    promissory estoppel, like the promise of -- the courts are

17    very clear that there's a big risk that people can just say

18    this kind of thing, and based on sympathies of the jury and

19    all those sorts of things you can get around a written

20    contract based on that kind of statement.  So it has to be --

21    and for that reason the courts impose a fairly stringent

22    definiteness test to the promise that is subject to promissory

23    estoppel, and it has to be -- your reliance has to be

24    objectively reasonable.

25         And in this case the written contracts clearly say they

1    have to be modified in writing, and that every one of the

2    writings says we're preserving, we're not waiving any rights.

3    And the promise is not definite.  It's a -- there was always

4    an application process involved.  There's no terms of any kind

5    of deal.  I mean so if we offered a modification at that point

6    with higher payments, I mean, you know --

7            THE COURT:  Doesn't it depend -- on this claim

8    doesn't it depend on what you're prequalified means, that

9    phrase, you're prequalified?

10           MR. THOMPSON:  I suppose it might but it doesn't --

11   just the allegation you're prequalified just doesn't give you

12   any of the definiteness that is necessary for this kind of

13   claim.  I mean that's all we've got here is you prequalified.

14   There isn't any other facts in the complaint about what they

15   told -- you know, what they thought that meant, what the bank

16   said that it meant, and there was always a modification

17   process contemplated.

18           THE COURT:  So how am I wrong if I view it this way

19   on a motion to dismiss, that taking the factual allegations in

20   the complaint as true, as I'm required to do, that there is a

21   plausible claim, that the elements of promissory estoppel may

22   be satisfied with respect to some damages but maybe not to

23   others, that there might be a promise, an inducement,

24   reliance, you're prequalified, we move back, there may be

25   damages as a result, but that those damages might not reach

1   all the way to refinancing or the mortgage, no assurance that

2   there would not be a foreclosure and the like?  Isn't it a

3   question of what -- what damages might be recoverable under

4   the facts as pled?

5           MR. THOMPSON:  I don't think so because I just -- I

6   cannot -- the case law talks about having a definite and

7   enforceable promise.  The terms are there.  The Court can say

8   this was the promise.  Prequalified for a HAMP modification

9   application is not -- that does not meet that standard.

10          And, you know, you can look at the forbearance agreement

11  which explicitly says that modification is one of the options

12  but certainly not the only option.  The loan -- the servicer

13  also reserved the right to either require them to reinstate,

14  to foreclose or to modify.

15          So we should move on then maybe to the ReconTrust issues,

16  which are my favorite.  And I think this might be one of the

17  last of the ReconTrust cases that is currently out there.   The

18  issue is in front of the Tenth Circuit in Garrett.  Oral

19  argument is scheduled for January 14.  The Utah bench is

20  fairly evenly split with Judge Sam and Judge Stewart on saying

21  that ReconTrust is authorized to exercise the power of sale,

22  notwithstanding the Utah prohibition, because the National

23  Banking Act indicates that where they perform three specific

24  functions is where they're acting in a fiduciary capacity, and

25  where they're acting in a fiduciary capacity is where -- is

1    which state's laws apply.

2              THE COURT:  Right.

3              MR. THOMPSON:  Now, I didn't brief it completely in

4    my briefs because Judge Waddoups is one of the judges who has

5    already decided that issue and went with Judge Jenkins and

6    Judge Benson on saying that, no, the Utah law does apply.

7              THE COURT:  Given the proximity of the hearing, the

8    oral argument on appeal, is there any reason that we wouldn't

9    give ourselves some time to be informed by whatever

10   instruction it is the Tenth Circuit gives us?

11             MR. THOMPSON:  There is one reason, which I will get

12   into a second, but if the court -- but I do see the Court's

13   point, and there is one issue in particular that I think we

14   might get some guidance from the Tenth Circuit's ruling, and I

15   hope that they rule quickly, and that is does it result in the

16   sale being void?

17        As we argue in our briefs, I don't think the Court needs

18   to reach the ReconTrust issue, and that's for several reasons.

19   The remedy for the unauthorized exercise of power of sale is

20   57 -- UCA 57-1-23.5.  And it provides that the remedy is

21   actual damages, statutory damages of $2,000, and attorney's

22   fees.  It does not provide, as it well could have, any such

23   sale is void.

24        So then you look at the common law, and the common law

25   says we're not going to set aside a foreclosure sale unless

1    there is prejudice sufficient to enable the court to determine

2    that the borrowers were unable to protect their interests.

3    And the reason that I don't think the Court needs to decide it

4    is all we have -- this statute, 57-1-23.5, the remedy, was not

5    applicable at the time of the foreclosure sale.  It went into

6    effect several weeks later.

7         So they don't have that right to -- and it's not

8    retroactive.  So they don't have that right to statutory

9    damages, actual damages or attorney's fees.  However, the --

10   and a statute, a prohibition -- the prohibitory statute,

11   57-1-21, which says that you have to be a lawyer or a title

12   company to exercise the power of sale, does not have a remedy,

13   and it standing alone does not create a cause of action.

14   There's a lot of law in Utah that says a statutory violation

15   standing alone, unless there's legislative intent otherwise,

16   does not create a cause of action.

17        The legislature in this case did indicate its intent when

18   it enacted 23.5, but it did not make it retroactive and it

19   also did not indicate that any such sale would be void.  And

20   the likely reason for that is the chaos in the property

21   records that such a ruling would entail -- I mean such a --

22   not ruling -- such a statute would entail.

23        So without an allegation that ReconTrust's role in this

24   process caused prejudice to the Plaintiffs, which there is no

25   such allegation here, there is no private right of action

1    merely because ReconTrust violated 57-1-21, if they did.

2        We cite several cases in our brief that say when the

3    legislature has specifically stated what the remedy is for a

4    particular violation, then courts are not to add additional

5    remedies, such as rendering a claim -- I mean the sale void.

6        So then you look again to the common law, which I

7    mentioned.  You have to show prejudice and inability to

8    protect your interests, and that issue was again affirmed in

9    the case that's cited in our supplemental briefs.

10            THE COURT:  But the Tenth Circuit's determination in

11   Garrett would impact at least the declaratory judgment claims.

12   Do you agree?

13            MR. THOMPSON:  Well, if the Court determines that

14   there is not -- there is no prejudice, there's no private

15   right of action by the statute alone, not considering the 23.5

16   which doesn't apply, then the only issue that the Garrett

17   decision I think could impact is whether the mere violation of

18   that 57-1-21, the statutory prohibition, renders the claim

19   void, because there is no authority, except for this 1880 case

20   cited by the Plaintiffs, to establish any kind of a remedy for

21   the unauthorized exercise of the power of sale.

22            THE COURT:  So is your --

23            MR. THOMPSON:  And I think if you had prejudice as a

24   result of ReconTrust, then you might have a different story.

25            THE COURT:  So is your argument akin to that the

1    Plaintiffs lack standing to assert the declaratory judgment

2    claims because even if we get partway down the road, we can't

3    get all the way there?

4              MR. THOMPSON:  Well, it's a -- it's a mootness

5    issue.  Yes.  I'd say yes it's standing.  There is case law

6    that says you're not entitled to just a declaratory judgment

7    that you were -- you were wronged.  You're not entitled -- you

8    know, it has to have some kind of practical effect.  And if

9    all we're talking about is whether ReconTrust had the power of

10   sale but there is no remedy associated with that, then you

11   cannot go for declaratory judgment.

12             THE COURT:  So assume for a moment -- I'm not

13   ruling.  But if one or more of the Plaintiffs' claims survive

14   the motion to dismiss, is there any harm or prejudice to the

15   Defendants if the Court denies without prejudice the motion

16   with respect to the declaratory judgment claims and the quiet

17   title claims and gives the Defendants leave to refile after

18   the Garrett decision?

19             MR. THOMPSON:  Other than that this case has

20   taken -- I mean, you know, we had a long stay and we were

21   trying to do some workout options and that didn't work out.

22   And so then there were several months in getting to a hearing.

23   Other than the fact that now, you know, the borrowers have had

24   the property for a long period of time, that's the prejudice.

25   But I certainly would defer to the Court if it wanted some --

1    I -- the reason I didn't brief this really is I don't want to

2    ask the Court to go out on a limb on an issue that is going to

3    be decided with binding authority fairly soon.

4         So I would not have an objection if you -- if the Court

5    felt that there was some issue that's alive in this complaint

6    that Garrett might address, which we argue there isn't, then I

7    think it would be a wise course to let the Tenth Circuit

8    decide that.  Of course I've had Tenth Circuit decisions take

9    18 months from the time of -- but I don't think it will take

10   that long in this case.

11              THE COURT:  All right.

12              MR. THOMPSON:  Finally quiet title.  It also relates

13   to whether or not the foreclosure sale, the trustee's deed is

14   void.  You know, I've argued about why I don't think there's

15   a -- rendering such, the sale and the deed, void is authorized

16   by either the common law or the statutes, but it's also just

17   not a proper remedy.  If you -- even if you declared the

18   trustee's deed void, it's not -- you shouldn't be -- we

19   shouldn't be quieting title in borrowers who have admittedly

20   defaulted on their loan three or four years ago now.  And also

21   because of that default, there's a cloud on their own title

22   and quiet title is not the appropriate remedy, even if the

23   trustee's deed were to be rescinded.

24        So unless you have any questions, I'll --

25              THE COURT:  I don't.  Thank you.  You'll have an

1    opportunity to address anything that Mr. Morse raises.

2              MR. THOMPSON:  Thank you.

3              MR. MORSE:  Good afternoon, Your Honor.  My name is

4    Dan Morse.  I'm here for the Kolkows.  And I was just going to

5    go in order.

6              THE COURT:  I think that would be great.  Why don't

7    we start with the breach of contract claim if we can.  My

8    first question for you is what is the contract that is the

9    subject of the breach?

10             MR. MORSE:  Well, I think in reading the complaint

11   again after I've -- after months have passed since I wrote it,

12   there are several contracts alleged in the complaint and

13   spelled out by the facts as alleged.

14             THE COURT:  There are many that are identified, I

15   agree.

16             MR. MORSE:  And there are many contracts that are

17   identified.  And I'd like to point the Court to the -- the

18   case is actually cited in the Defendants' brief, but that I

19   had the pleasure of being counsel on before Judge Stewart.  It

20   was the Gayleen Coates case versus Wells Fargo.  And I think

21   that might have been what you were referring to earlier on.

22        But in it Judge Stewart, in denying Wells Fargo's motion

23   to dismiss my client's breach of contract claim, stated as

24   follows:  To state a breach of -- to state a breach of claim

25   for contract you must show a contract performance, breach of

1    the contract and damages.  And then we had argued that the

2    defendants had agreed to temporarily modify her loan by

3    accepting lesser payments which would be credited to her

4    account, and that she did submit these partial payments.

5         Now, that's sort of -- that's analogous, you'll notice in

6    my pleading here, and that must be construed in my clients'

7    favor where they were told they're prequalified and to send in

8    a payment of fourteen-sixty-five-twenty-six, which they did,

9    and then they -- the package never arrives and, you know, they

10   never got their modification there.  The next month arrives

11   and they're told again, okay, okay, we'll get you a

12   modification packet.  Give us $1,500.  They do it.  Never --

13   it never shows up.

14        So there alone is the type of contract that was -- and I

15   believe the facts show a breach as well, as discussed in the

16   Coates case.  And that did end up triggering an exception to

17   the statute of frauds as recognized by Judge Stewart.  And the

18   supporting case law was Fisher v. Fisher out of the Utah Court

19   of Appeals.  So that's just one of the contracts --

20             THE COURT:  Well, but we've got to do better than

21   that.

22             MR. MORSE:  I know.  We've got other ones, don't

23   worry.

24             THE COURT:  No.  Hold on a moment.  For breach of

25   contract we need to identify a contract.

1          MR. MORSE:  Correct.

2          The COURT:   We need to identify a specific term of

3    the contract.

4          MR. MORSE:  Right.

5          THE COURT:  And allege a breach and then damages and

6    the like, right?

7          MR. MORSE:  Uh-huh.

8          The Court:  And I think -- I'm looking at the

9    amended complaint.  Paragraphs 88 through 94 I think are the

10   most relevant.  In fact they're the only paragraphs that

11   really purport to identify agreements and a bases for breach.

12   But there's not even an allegation on the face of this claim,

13   is there, of any specific term of any of these agreements that

14   the Plaintiffs contend the defendants breached?  Am I wrong?

15         MR. MORSE:  Other than that there was an agreement

16   to give them the modification, which they never did.

17         THE COURT:  Well, where does it say that in your

18   first cause of action?

19         MR. MORSE:  That's incorporated by reference, 87,

20   and that's why there's copious facts prior to 87.

21         THE COURT:  Okay.  So is the breach of contract

22   claim asserted vis-a-vis an oral agreement between the

23   Plaintiffs and the bank?

24         MR. MORSE:  That is one.  That is one of the

25   contracts.

1            THE COURT:  Okay.

2            MR. MORSE:  There is another.

3            THE COURT:  All right.

4            MR. MORSE:  The deed of trust -- the deed of trust

5     itself under -- by which secured the promissory note, in it

6     said any -- if there is a default, any foreclosure activities

7     will be conducted pursuant to applicable law.  That didn't

8     occur.  They foreclosed with an unauthorized trustee, that's

9     what we've alleged, that did not have the power to exercise

10    the power of sale at a foreclosure sale and that's what they

11    did.  So they breached their own written agreement on the deed

12    of trust.  So that's another one.

13            THE COURT:  Are there more?

14            MR. MORSE:  Yes.

15            THE COURT:  Okay.

16            MR. MORSE:  Servicer Participation Agreement.

17            THE COURT:  You disagree that the Plaintiffs lacked

18    standing to --

19            MR. MORSE:  I completely disagree.  There are cases

20    that -- I mean they make a general -- the Defendants make a

21    general allegation that there are cases around the country

22    where it's been found there are -- somebody is not -- the

23    borrower is not a third-party beneficiary to a servicer

24    participation agreement.  Yes, there are cases that way, but

25    there are also cases that cut the other way.  It's a divided

1   decision there.

2        And also the banks, when these -- when these HAMP

3   programs came to light or came into being after the financial

4   crisis, the banks were given incentives, you know, from 500 to

5   $1,500 to send people prequalification letters and get them

6   evaluated for HAMP.  And in fulfilling their duties, those are

7   the type of agreements we need to see.

8        I mean they're saying that they're not a third-party

9   beneficiary in the contract.  I don't have the contract, but

10  I've alleged that it exists, and I've alleged they're a

11  third-party beneficiary under it.  So unless they want to

12  produce that SPA agreement, we can't say, no, they're not a

13  third-party beneficiary.  Let's see the agreement.  They might

14  be.  It might be there in black and white.  And at this point

15  in the -- at this stage in the pleadings, we have a right to

16  do discovery to find that agreement and see if they're a

17  third-party beneficiary under that contract.  We can't just

18  blindly say, oh, no, they're not, because apparently some

19  other cases have found they're not.  We need to see the

20  contract.  And I think that's reasonable to get into

21  discovery, get the Servicer Participation Agreement and read

22  it and see if they're an intended beneficiary because they

23  really might be.

24            THE COURT:  So is the nature of the claim with

25  respect to the SPAs that we don't yet know if we're

1    third-party beneficiaries but we might be, and we don't know

2    what the terms of that agreement are, but it's possible that

3    the banks breached that agreement in some respect that affects

4    our rights?

5              MR. MORSE:  Based on what we know -- and that's why

6    we have allegations in here about the OCC consent decrees and

7    things like that.  That is one of the directional indicators

8    that the banks were not doing what they were supposed to do

9    under those agreements.  And so we'd like to see that.

10             THE COURT:  Okay.  So what are the terms of the oral

11   agreement for example on which the breach of contract claim

12   rests?  Where do we find the terms of that contract?

13             MR. MORSE:  All right.  I would point to facts 30

14   through 45 of the complaint.  Plaintiffs contacted BAC and

15   were told by Desmond Hunt on June 22nd that they were in

16   review (unintelligible) --

17                  (THE COURT REPORTER INTERRUPTED)

18             THE COURT:  When you're reading especially, you need

19   to slow down so that our court reporter can get what you're

20   saying.  But let me just -- let me just help you here.  I've

21   read very very carefully this series of factual allegations in

22   the complaint several times.  It's not your contention, is it,

23   that this describes with any level of specificity the terms of

24   an oral agreement with consent, and a meeting of the minds, a

25   negotiated agreement that's mutually binding?

1       MR. MORSE:  No.  I -- I wouldn't say that it has the

2  terms of what the loan modification that they're being

3  prequalified for would be in it.  It does not set out those

4  terms, but --

5       THE COURT:  So what is the contract?

6       MR. MORSE:  Well, I would say that the contract does

7  say if you do this and you send us this money and you send us

8  this information, we will -- you're prequalified for a HAMP

9  modification and you will get a loan modification.  Those are

10  the -- that's all the terms we have right now but they paid

11  the consideration for it and it never came.  They got jerked

12  around for months and months after that.  And here is the

13  other point --

14       THE COURT:  Well --

15       MR. MORSE:  Okay.  Go ahead, I'm sorry.

16       THE COURT:  Go ahead.

17       MR. MORSE:  In listening to the description of all

18  this, I'd like to set the record straight on there's nothing

19  in our complaint that admits a default.  We don't even use the

20  term default and there was no default.  We actually say at

21  complaint paragraph 22 and 23 with respect to the forbearance

22  agreement that the Plaintiffs accepted the forbearance

23  agreement and made all the payments due under the plan.  And

24  that --

25       THE COURT:  I've got that.

1          MR. MORSE:  You see that.

2          THE COURT:  I'm going to bring you back to the

3   contract.  We're going to tackle this one issue at a time.

4          MR. MORSE:  Gotcha.

5          THE COURT:  I'm looking at paragraphs 92, 93 and

6   94.

7          MR. MORSE:  Okay.

8          THE COURT:  This is where the Plaintiffs

9   specifically allege how the contracts, the unidentified

10  contracts, are breached:  By deliberately losing documents

11  sent by the Plaintiffs; by failing to properly account for and

12  apply the payments made by the Plaintiffs; and by failing to

13  communicate with the Plaintiffs in a truthful and forthright

14  manner about their HAMP loan modification application.

15         MR. MORSE:  Okay.

16         THE COURT:  There is nowhere in your complaint that

17  I can see or in any of the materials that support this

18  complaint, and I've looked at all of them, where I can

19  identify those as material terms of agreements between the

20  Plaintiffs and the Defendants.  Have I just missed it?

21         MR. MORSE:  As far as enforcing an oral contract,

22  no.  I mean --

23         THE COURT:  Or written agreements?

24         MR. MORSE:  Okay.  Now, written agreements, yes.

25  We'll look at what we have in writing.  Okay.  We have -- we

1    have the forbearance agreement.  We have the promissory note,

2    which is a negotiable instrument under UCC 3, and we've got

3    the deed of trust, right?  That's pretty much --

4              THE COURT:  And the underlying loan agreement.

5              MR. MORSE:  And the underlying loan agreement,

6    correct.  Now, in a breach of contract, inherent in every

7    contract, implied in all contracts is the covenant of good

8    faith and fair dealing.  So what those -- when you point to

9    93, 94 and 95 -- or 92, 93, 94, those allegations are there in

10   showing the breach of the implied covenant of good faith and

11   fair dealing in even the written contracts.  See, that's what

12   that supports.

13        In addition to when you do this, when you deliberately

14   lose documents, that's bad faith.  When you fail to properly

15   account for and apply payments the Plaintiffs have made,

16   that's bad faith.  Your contractual duty is to -- is to manage

17   your documents correctly, is to, when you get a payment, to

18   apply it to the correct loan account, and --

19             THE COURT:  Well, but the --

20             MR. MORSE:  -- do not lie.

21             THE COURT:  The covenant of good faith and fair

22   dealing --

23             MR. MORSE:  Yeah.

24             THE COURT:  -- protects the underlying interest that

25   a party has in an agreement, right?

1          MR. MORSE:  Yes.

2          THE COURT:  That you're not deprived of the benefit

3    of your bargain.

4          MR. MORSE:  Right.

5          THE COURT:  So which bargain is it that the

6    Plaintiffs were -- I understand the facts that are alleged.

7    There's no right for example under the underlying loan

8    agreement to a modification.

9          MR. MORSE:  No, no, but under the underlying loan

10   agreement you are -- you have the right to have your payments

11   applied properly and for them to accept the payments when you

12   tender them.  And that's one of the allegations we have here,

13   that they've made a $1,500 payment that they just wouldn't

14   accept.  I mean and that violates the actual underlying loan

15   agreement.  That's a breach of that loan agreement to not

16   apply the payments correctly.

17         THE COURT:  Okay.

18         MR. MORSE:  So that's an example --

19         THE COURT:  Okay.

20         MR. MORSE:  -- of that kind of breach.  Now, look, I

21   admit that I would just -- I would say this.  If the Court's

22   leaning towards saying, you know, I just can't find a contract

23   here, I would submit that there are enough facts alleged that

24   you can't as a matter of law say under no set of factual

25   circumstances would the Plaintiffs be entitled -- or be able

1    to sustain a cause of action for breach of contract.  I think
2    we're getting -- I think we can all see that in fact that is a
3    valid claim in a case like this.  If it needs to be more
4    artfully pled --
5            THE COURT:  But you've misstated the standard I'm
6    supposed to apply at this stage, right, under Iqbal and
7    Twombly.  It's a more rigorous standard than that.  But beyond
8    that, it's my job, isn't it, to make legal determinations,
9    including for example whether there's an existing agreement --
10           MR. MORSE:  Right.
11           THE COURT:  -- a legally enforceable contract --
12           MR. MORSE:  Right.
13           THE COURT:  -- and the like.  We agree about that?
14           MR. MORSE:  We certainly agree about that.
15           THE COURT:  Okay.  I think I understand your
16   argument with respect to the breach of contract claim.
17   Let's --
18           MR. MORSE:  And I hope to make it more specific.
19   I'm sorry.  Let's try negligence next.
20           THE COURT:  That's all right.  That's great.  We'll
21   turn to negligence.
22           MR. MORSE:  Okay.  Now --
23           THE COURT:  And let me just -- let me cue you into
24   where I'm focused on negligence.  I'm really focused on duty.
25   It's the first element of the cause of action.

1        MR. MORSE:  Absolutely.

2        THE COURT:  I don't see that the case law supports

3   the theory that there's an independent duty between homeowners

4   and banks who have different and competing interests.

5        MR. MORSE:  You're correct.  There's a -- I would

6   say we would characterize that as a debtor/creditor

7   relationship.  However, I go back to Arrow Industries versus

8   Zions Bank.

9        THE COURT:  Right.

10       MR. MORSE:  And I've actually highlighted the

11  portion that I think has (unintelligible) in it.

12       THE COURT:  Okay.

13       MR. MORSE:  And I have a highlighted portion for the

14  Court and for counsel.

15       THE COURT:  Thank you.

16       MR. MORSE:  There's two portions of this case I've

17  highlighted because they're dead on.  So when I was before

18  Judge Stewart in the Coates case, I didn't ever get to do oral

19  argument because the -- the case just sort of -- the homeowner

20  moved on and so we never really got to get into this.  But it

21  was determined there that this Arrow Industries case was just

22  about checks and the presentment of checks to banks, and so it

23  didn't really apply to all UCC dealings in the State of Utah.

24       However, in the case itself the Utah Supreme Court is

25  pretty clear that this extends to all transactions under the

1    UCC.  And in footnote 18, which I've also highlighted, you'll

2    see where they're coming from.  But the basic premise is they

3    cite with favor the authority from Phillips Home Furnishings.

4    I think it's a Pennsylvania case.  And it says we hold that a

5    bank cannot contractually exculpate itself from the

6    consequences of its own negligence or lack of good faith in

7    the performance of any of its banking functions.  We find that

8    the public need for professional and competent banking

9    services too great and the legitimate and justifiable reliance

10   upon the integrity and safety of financial institutions too

11   strong to permit a bank to contract away its liability for its

12   failure to provide the service and the protections its

13   customers justifiably expect, that is, for its failure to

14   exercise due care and good faith.

15       Now, my point is that this precedent says that there is a

16   duty independent of contract arising in tort to exercise due

17   care and good faith in the conduct of banking operations, all

18   of the banking functions, including those and specifically

19   those set forth in the UCC.

20       Now, so what kind of UCC animals are we dealing with

21   today with a promissory note and a deed of trust?  We're

22   dealing with Article 3 and Article 9 of the UCC, negotiable

23   instruments and secured transactions.  And if there is a -- I

24   would just say if there is a question as to whether or not in

25   the State of Utah there is an independent duty arising in

tort, I would suggest that we certify it to the Supreme Court
under Rule 41 of the Utah Appellate Rules to see.  Because if
they're unclear -- I think this is clear, but if anyone thinks
they're unclear, again, I would point to footnote 18 in this
case.  It says although the Court in (unintelligible) --

(THE COURT REPORTER INTERRUPTED)

MR. MORSE:  Actually I don't even -- don't worry
about that.  That's not what we want.  Given our holding
concerning the bank's duty to act in good faith and exercise
ordinary care in all its dealings, another exception is
recognized.  That's the point.  In this case they recognize
the bank's duty to act in good faith and exercise ordinary
care in all its dealings, and that includes being a lender on
a home loan.

THE COURT:  So in every tort-based claim asserted
against a financial institution, the first element is just
always satisfied by virtue of the identity of the defendant.
If it's a bank or financial institution, there's a duty
period.

MR. MORSE:  For the reason given that financial
institutions, too big to fail, they're cornerstones of our
economy, people must trust them.  You must trust the bank
you're dealing with or else there will be chaos, rioting in
the streets, that type of -- that's the public policy
rationale and it's outlined right here.

1          THE COURT:  And there's no distinction if your

2     interaction with the bank is as a depository for your life

3     savings or whether they will endorse a check that you write or

4     whether you're contracting with a bank for a loan for a car or

5     for a home or whether a bank is underwriting a transaction for

6     the acquisition of a company or whether it's -- you're saying

7     there's always a duty if --

8          MR. MORSE:  I'm saying if it's covered by the UCC,

9     those -- that this duty arises.

10          The COURT:   And the proposition -- the legal

11     authority that you submit supports that proposition is just

12     this case, right, the Arrow Industries case, the 1988 decision

13     from the Utah Supreme Court?

14          MR. MORSE:  This is my case.  It's not been

15     overruled and hasn't even really been distinguished when I

16     Shepardized it.

17          THE COURT:  And just to be clear, make sure I

18     understand it, the highlighted portion opinion that you're

19     highlighting here is from the Phillips Home case?

20          MR. MORSE:  Correct.

21          THE COURT:  Right.

22          MR. MORSE:  It was language that the Supreme Court

23     apparently agreed with.

24          THE COURT:  Okay.  Okay.  All right.  I understand.

25          MR. MORSE:  Now, I have one other duty if that isn't

1    enough, breach of the -- breach of the statute itself.  I

2    have -- in my experience I have argued before the breach of

3    the statute itself is negligence per se.  It certainly is when

4    violation -- violation of safety statutes, violation of this.

5    When you violate the nonjudicial foreclosure statute, that's

6    negligence per se.  That's the first -- you had a duty to

7    follow the statute if you're going to utilize the nonjudicial

8    foreclosure scheme.  So there's the duty.  You will follow the

9    statute.  If you don't, there's your breach.  The damage it

10   caused, you've just messed up somebody's title and here we

11   are.

12            THE COURT:  Well, okay.  Now you're focused on my

13   next question.

14            MR. MORSE:  Yeah, Sort of going --

15            THE COURT:  Harm.

16            MR. MORSE:  Harm, yes.

17            THE COURT:  Both under your breach of contract

18   theory I suppose insofar as you're talking about not

19   foreclosing in the way you said you would.

20            MR. MORSE:  Right.

21            THE COURT:  And also here on your tort theory.  What

22   specific harm befell your clients?

23            MR. MORSE:  Well, specifically my clients had equity

24   in their home.

25            THE COURT:  Okay.

1              MR. MORSE:  Okay.  So if they had been under water

2     and you've taken away a liability, is that harm?  Probably

3     not.  But they were not under water.  They had equity in the

4     home.  And so when you take away that property interest,

5     you've taken away an asset potentially.  The other harm is --

6              THE COURT:  Well, not potentially.

7              MR. MORSE:  Yes.

8              THE COURT:  Well, did they in this instance?  Did

9     your clients -- is it pronounced Kolkow?  I've been saying

10    clients and not referring to them by name.

11             MR. KOLKOW:  It's Kolkow, just like if I was to call

12    you on the phone.

13             THE COURT:  Kolkow.

14             MR. KOLKOW:  Kolkow.

15             THE COURT:  I mean no disrespect by not --

16             MR. KOLKOW:  If you get it right, you probably won't

17    respond.

18             THE COURT:  So the Kolkows, did they lose their

19    equity interest in their house at this foreclosure?

20             MR. MORSE:  Yes, they did.

21             THE COURT:  And would they not have lost that equity

22    interest had the bank foreclosed in a manner that you suggest

23    they were required to do?  Suppose the bank complied with the

24    nonjudicial foreclosure statute --

25             MR. MORSE:  Correct.

1          THE COURT:  We still have a foreclosure.

2          MR. MORSE:  Yep.

3          THE COURT:  And the Kolkows still lose their equity

4   position in the house, do they?

5          MR. MORSE:  That is correct, yes.

6          THE COURT:  Okay.  So what harm befalls the Kolkows

7   if the bank failed to foreclose in the way that they were

8   required to foreclose?

9          MR. MORSE:  Well, I mean we can show that the

10  fallout of all this wrongful foreclosure resonates domino

11  effects through consumer credit and all this.  But I think --

12  this is what I love.  You don't have -- believe it or not,

13  harm is not the issue in an argument that a sale is void.

14  Okay.  I know we're talking about contract and negligence

15  right now and you have to -- so if -- if -- in this case the

16  harm -- I have a case where the harm is presumed when you lose

17  title to real property.  I would like to find that.  Because

18  real property is unique, you know, and although can be

19  converted to economic metrics and whatnot --

20         THE COURT:  But it's not your position, is it, in

21  this case that the bank was prohibited from foreclosing?

22         MR. MORSE:  It's prohibited from foreclosing in the

23  manner it did.

24         THE COURT:  Understand.

25         MR. MORSE:  But not ultimately if they had done it

1    right, but they didn't do it right so --

2              THE COURT:  Understand.  So your case about losing

3    title, that doesn't get you home here, does it, because --

4              MR. MORSE:  It does here because this is actually

5    what happened.

6              THE COURT:  But as I understand what you're saying,

7    the Kolkows were going to lose title one way or the other.

8              MR. MORSE:  Well, no, they wouldn't have lost title

9    if they hadn't -- like if they hadn't moved and kicked out

10   renters that were paying the mortgage, who is to say that they

11   would have lost title?  They would have still been paying for

12   the house so they would have still had title.

13       It's not -- and certainly the facts in my complaint don't

14   say that they were in default or that they were in -- you

15   know, they got offered a better deal from the bank, and they

16   wanted to take it, so they moved back, much to their detriment

17   arguably.  But it's not a foregone conclusion that they would

18   have lost the house if they had not listened to the bank.

19   They probably wouldn't have lost the house and the bank might

20   not have been able -- see, because they were in compliance

21   with the forbearance agreement.  There was no default.  After

22   the forbearance agreement they were back in -- the loan was

23   back in good standing arguably.  So there wouldn't have been

24   default proceedings even initiated -- or foreclosure

25   proceedings initiated if not -- but for the negligence, we

1    might not have gotten to foreclosure.  That's I believe there

2    in the complaint.

3              THE COURT:  Okay.

4              MR. MORSE:  So I would like to -- if the Court has

5    already read my -- the Singer versus Chalmers case, I think

6    that's a great place to go next for quiet title.  And again I

7    have a copy for the Court and a copy for counsel with the

8    relevant portion highlighted.

9              THE COURT:  You've turned now to the quiet title

10   claim?

11             MR. MORSE:  Yeah, quiet title.

12             THE COURT:  Go ahead.

13             MR. MORSE:  So this is one of the -- this -- yes,

14   this is an old case.  It's from 1880, but it hasn't been

15   overruled or it's still good law.  Sometimes when you get it

16   right the first time, even back in 1880, it can hold up for

17   centuries.  So here we are at page nine or 547, depending on

18   where you cite it from.  The fact that no injury or fraud in

19   the sale has been shown does not affect the question, nor is

20   it affected by the fact that the purchaser was an innocent

21   party.  The sale was made by one not authorized to make it and

22   cannot be upheld.  It is simply void and no one gains any

23   rights under it.

24       Now, it's important -- this is important, and the reason

25   it works in our society is it keeps just any old person from

1    selling any old piece of property on the courthouse steps and

2    making chaos.  You have to have the authority to exercise the

3    power of sale, either under the written document, or if you're

4    using the nonjudicial foreclosure statutes, under those

5    statutes.

6        You can't have it both ways.  You can't -- because all

7    states are not nonjudicial foreclosure.  I'm sure you're

8    aware.  Some states are judicial foreclosure, some states are

9    not.  If you want to take advantage of the fast-track

10   nonjudicial foreclosure route where you have a trustee sale on

11   the courthouse steps, you've got to comply and you've got to

12   be authorized.

13           The COURT:   Does the quiet title claim help the

14   Kolkows in this case?

15           MR. MORSE:  It does because -- and I can explain

16   why, why it's there.  There was a sister case to this where

17   Fannie Mae came into court up in Ogden and tried to evict the

18   Kolkows, and we said this trustee's deed that Fannie Mae

19   claims that they own the property now under is invalid, Your

20   Honor, because they got it from ReconTrust who didn't have

21   anymore authority to sell it on the courthouse steps than

22   some, you know, transient that just wanted a buck.  There's

23   really no difference.  When you don't have authority to sell

24   it, I mean it's void.  And now so --

25           THE COURT:  But you don't contend that the Kolkows

1    own the title to the house?

2             MR. MORSE:  No.  They -- they have title to the

3    house, but I'm not saying it strips away the deed of trust or

4    the loan.  I mean the loan is still there.  Ultimately this is

5    how we would like it to be -- to be done.  The foreclosure

6    sale is void, like it never happened.  Not -- it's not

7    rescinded.  There's nothing to rescind.  It just has no

8    effect.  And then we're going to have to now at this late date

9    reform the agreement a little bit such that they pick up the

10   payments where they left off right before they couldn't make

11   them anymore or because of the conduct of the Defendants.

12        But we're not trying to get rid of the obligations on the

13   house or saying that there isn't a loan owed.  We are saying

14   that the warranty deed according to 2004 is superior title to

15   the trustee's deed that Fannie Mae got at the foreclosure sale

16   that was conducted by an unauthorized trustee.

17             THE COURT:  And who owns title under the warranty

18   deed?

19             MR. MORSE:  The warranty deed vested title in the

20   Kolkows subject to the lien of the trust deed.  And we're

21   saying that's still there, and that should be.  I mean they're

22   not trying to avoid any obligation.  They're just trying to

23   get it so that -- you know, that can get back on track, paid

24   off like 90 -- I don't know what the percentages are anymore,

25   let's say 95 percent of homeowners in the United States.

1          The COURT:   Does the Garrett decision implicate the

2     relief to which the Plaintiffs may be entitled and quiet

3     title?

4          MR. MORSE:   It would because if the Garrett

5     decision -- if Judge Stewart -- or I can't remember if it's

6     Judge Sam's or Stewart on Garrett -- Sam's, okay.   So if the

7     Tenth Circuit says that ReconTrust did have the authority to

8     exercise the power of sale, then the foreclosure sale would

9     not be void and that would be it.   Then the trustee's deed

10    would be valid and it would be superior to -- it would have

11    divested the Kolkows of ownership entirely.

12         But at present we're saying that that trustee's deed is

13    of no effect.   Like I say, we're not -- they're not trying to

14    avoid an obligation.   I think that would be abhorrent, and we

15    would never request that kind of relief, nor is that

16    equitable.   But it is equitable to say, hey, go back, and if

17    we can't work this out, you know what, do the foreclosure

18    right because it's not inconsequential.   And the case law of

19    Utah says that, you know, the fact that no injury or fraud in

20    the sale has been shown doesn't affect the question.   I mean

21    that's it.   I mean that's a red herring.   Just because they've

22    suffered no prejudice because they were going to get

23    foreclosed on anyway, it doesn't mean you're allowed to just

24    sell their house willy-nilly if you don't have the authority

25    to do it.   So that's our quiet title.

1        And as for Babcock versus RM Lifestyles, in RM Lifestyles

2   the person seeking to quiet the title, they were seeking

3   rescission, okay, or to set it aside that way because of an

4   irregularity in the foreclosure sale.

5            THE COURT:  Well, the trustee lacked authority to

6   conduct the sale.

7            MR. MORSE:  I think it was that they did the notice

8   wrong --

9            THE COURT:  Well --

10           MR. MORSE:  -- and that's different.

11           THE COURT:  But the -- okay.

12           MR. MORSE:  That's -- there's a distinction there.

13   Ultimately that trustee could have been appointed trustee.

14   But in this case this person could never have been the

15   trustee, or ReconTrust could never be the trustee.

16           THE COURT:  And that's how you distinguish that

17   case?

18           MR. MORSE:  Yes.

19           THE COURT:  The result in that case you distinguish

20   on that basis?

21           MR. MORSE:  They're different.  This is void.  That

22   was seeking rescission.  They're different legal animals.

23   We're not looking to undo it.  We're saying it never happened.

24   It's -- I hope you don't think it's too clever by half but

25   it's just black letter law in our opinion.

1           THE COURT:  I understand your argument.

2           MR. MORSE:  And I did want to inform the Court of

3   one other pending thing that might resolve this as well.  In

4   addition to the Garrett argument at the Tenth circuit, on

5   October 3rd of this year our firm and their firm presented

6   oral arguments at the Utah supreme Court that raised

7   ReconTrust authority issues as well, and that was briefed

8   before the Utah Supreme Court.  So they may come out with a

9   decision even before the Tenth Circuit on what the state of

10  the law is in Utah with regard to unauthorized trustees and

11  preemption and stuff.

12      With regard to negligent infliction of emotional distress

13  and --

14          THE COURT:  I really have just one question about

15  that initially.  Why isn't the allegation in paragraph 123

16  exactly the kind of conclusory statement in support of an

17  emotional distress claim that the case law tells me I can't

18  sustain?

19          MR. MORSE:  Well, how is it different?

20          THE COURT:  Yes.  You agree that the cases are clear

21  that I can't sustain a claim where there is only a conclusory

22  allegation about the distress, right?

23          MR. MORSE:  Correct.  But I would say that we've

24  broken it out into identifying the mental components that they

25  suffered, being anguish, stress, distress, anxiety that caused

1   the bodily injury, and that as soon as we can do our initial

2   disclosures, we'll be able to provide the physicians and --

3   this is a fact -- this is a fact question, right, as to --

4            THE COURT:  Well, today --

5            MR. MORSE:  -- as to the extent of their --

6            THE COURT:  Today it's a question about the

7   sufficiency of the pleading --

8            MR. MORSE:  Right, right.

9            THE COURT:  -- on its face.

10           MR. MORSE:  But I would say it would be hard to

11  describe it much more -- I mean I say the mental anguish,

12  stress, distress and anxiety which caused the bodily injury

13  and harm requiring physical treatment so identified that they

14  did have to seek medical treatment, that it caused injury to

15  the body, and I identified the conditions.  You know, I think

16  the expert testimony will show exactly what -- what the, you

17  know, psychological definition of it is, or if the Court

18  needed more physical symptomology we could explain like the

19  rashes, the heart, high blood pressure and the --

20           THE COURT:  Is it your view that --

21           MR. MORSE:  I think that 123 is sufficient because

22  it's not -- it's -- it's not -- it's not just saying we

23  suffered some emotional distress.  We're saying here is the

24  form of the emotional distress that led to the bodily harm.

25  Now, we could identify the bodily harm a little more, but --

1          THE COURT:  Your position is that on its face this

2    is not conclusory and it includes sufficient detail to fall

3    outside of the prohibition on conclusory allegations in

4    support of the emotional distress claim?

5          MR. MORSE:  I would hope so, Your Honor, based on

6    the -- just the broken out description of the -- of the mental

7    state.

8          THE COURT:  Okay.  Let's turn for a moment to the

9    promissory estoppel claim.

10         MR. MORSE:  Certainly.

11         THE COURT:  Did I mischaracterize your claim when I

12   was speaking with Mr. Thompson?

13         MR. MORSE:  No.  I actually thought you stated it

14   rather eloquently.

15         THE COURT:  So how far down the path do you believe

16   this claim is intended to apply?  Are the damages flowing from

17   the promissory estoppel here the costs associated with leaving

18   their residence in Arizona, moving here, there may be some

19   costs or damages relating to leaving employment in Arizona?

20         MR. MORSE:  Right, the differential between

21   income.

22         THE COURT:  And then, what, lost income from the

23   rent that the Kolkows were receiving?

24         MR. MORSE:  Correct.

25         THE COURT:  In the Huntsville home?

1          MR. MORSE:  Correct.

2          THE COURT:  And that's the scope of consequential

3   damages in general --

4          MR. MORSE:  Yes.

5          THE COURT:  -- that you have --

6          MR. MORSE:  Of their reliance on the statements.

7          THE COURT:  Not reaching into the foreclosure issues

8   on that claim?

9          MR. MORSE:  No.

10         THE COURT:  Right.  Okay.  Okay.  I'll put to you

11  the same question I asked Mr. Thompson.  What harm or

12  prejudice befalls the parties if there are one or more claims

13  that survive this motion?  If the Court's -- if the Court

14  denies without prejudice to the bank to refile the quiet title

15  claim and the declaratory judgment claim, why wouldn't we wait

16  for the Garrett decision?

17         MR. MORSE:  I believe that might be prudent and save

18  all parties money and time and the court time as well.

19         THE COURT:  You would -- if one or more claims

20  survive this motion to dismiss, the parties will engage in

21  discovery and set off down the path?

22         MR. MORSE:  Right.  So then it would actually be

23  even more substantial.  We wouldn't be in the hypothetical, we

24  have discovery items and, you know, they could bring a summary

25  judgment or we could bring a summary judgment.

1          THE COURT:  But what I'm interested in probing with

2     you now is whether I'll be exposing the bank to massive and

3     sweeping discovery requests on the quiet title claim and the

4     declaratory judgment claim if -- if we proceed in the way I've

5     just described?

6          MR. MORSE:  I would say that I believe Mr. Thompson

7     and I could craft a discovery order that prevented some

8     nebulous search for smoking guns, if that's what the Court was

9     concerned about.

10         THE COURT:  Well, what factual discovery do you

11    think would be relevant to the quiet title and declaratory

12    judgment claims?

13         MR. MORSE:  Honestly I believe -- you know, I

14    believe a big portion of the declaratory judgment claims,

15    based on the fact that, you know, it's undisputed that

16    ReconTrust is not an attorney or title company, and so I mean

17    those facts are undisputed.  It's like we're almost ready to

18    just get those resolved now and we would just want to wait for

19    the Garrett decision.  So there's not a lot of discovery

20    that's needed on the quiet title or declaratory judgment.

21         THE COURT:  Right.  And quiet title would turn on,

22    it seems to me, facts that are not in dispute in this case and

23    the chain of title, which is a matter of public record.

24         MR. MORSE:  Correct.

25         THE COURT:  Okay.

1          MR. MORSE:  There's no fact witnesses.

2          THE COURT:  I just wanted to see if we were largely

3     on the same page on that issue.  All right.  Is there anything

4     else you'd like me to consider?

5          MR. MORSE:  No.  Your Honor, only if there really is

6     a question too about negligence that you -- or duties arising

7     under some previous decision or precedent of the Utah Supreme

8     Court, it -- it might -- if we -- if we ask them about it now,

9     it might come in the same time as Garrett.  So I don't -- I

10    don't know if you want to as a matter of expediency do that.

11    Otherwise, if you're confident in the way the case law is, I'm

12    not -- I'm not going to make a motion on Rule 41 at this

13    point.  There's no point.

14         I don't know if the Court was still considering the

15    tender rule that was raised in the brief of the Defendants,

16    but I would just distinguish the effect of the tender rule was

17    when a party is seeking to rescind a contract.  And I'm

18    representing to the Court that we have not mentioned

19    recession.  We're not trying to get a rescission of the loan

20    agreement, a rescission of the trust deed or anything.  Maybe

21    we're just having -- we just -- we're just seeking a

22    declaration that the trustee's deed is void.  So I would say

23    the tender rule isn't applicable because it's -- I mean we

24    actually want to enforce the contract between the parties with

25    regard to the loan agreement.

1          THE COURT:  Do you contemplate that the Kolkows

2    would be making some back payment for months for which they've

3    not been paying a mortgage?

4          MR. MORSE:  I would contemplate that -- now there is

5    where I would see the need for the Court to use equitable

6    powers to say, well, look, you couldn't make the payments here

7    from that date that they stopped accepting the 1,500.  What

8    are you supposed to do?  I mean is the bank allowed to keep

9    accruing interest on that when they wouldn't accept the

10   payment?

11      I would say that that's where equity would step in and we

12   can talk about reforming the arrangement between the parties

13   to at least get it back to -- back in the box and back on

14   track.

15         THE COURT:  We're stretching the limits of the

16   Court's authority at that point, are we not, to start

17   recrafting private --

18         MR. MORSE:  No.  I mean the door is still open for

19   reformation to the point that it still respects the original

20   agreement of the parties.  And I would say that that doesn't

21   stretch it too much.  So, anyway, I'll yield to Mr. Thompson.

22         THE COURT:  Thank you, Mr. Morse.

23         MR. MORSE:  Thank you.

24         THE COURT:  Mr. Thompson, I'll let you have the last

25   word since I started with you.

MR. THOMPSON:  Okay.  Just to follow up on some of
the things that were at the very end of that.  The tender
rule, if it's not applicable it's because it's a California
rule that has not been, as far as I know, adopted in Utah.
But the rule is if you asked for the equitable right of --
remedy of rescinding a foreclosure, you must do equity
yourself by tendering the amount that you admittedly owe.  So
it is an equitable rule and it would apply in this situation
if it were adopted.

On the discovery issue I agree with Mr. Morse that on the
quiet title and declaratory judgment it's a question of law.
There really is nothing in dispute as far as I know about
that, so I agree.  And I also have a good relationship with
him and I don't have any concerns about that.

He's a great lawyer, and I've worked with him a lot and
he does great work for his clients, but in this case I just --
I feel like this is a complete moving target.  This is not
pled as a modification of the note, the deed of trust.  If it
were pled that way, we would have the right -- we would have
argued about statute of frauds, we would have argued about the
lack of consideration, we would have argued about a meeting of
the minds.  There's so many things that we would have argued
about that -- you can't amend your complaint through a
memorandum in opposition.

Similarly, this breach of contract claim based on

1    ReconTrust's role is, as far as I can remember, not pled.  On

2    the SPA, the Servicer Participation Agreement, counsel says

3    that there are cases going both ways, but there are none cited

4    in his brief.  If there was something cited in his brief

5    that -- I'm not aware of any.

6        All I know is the cases I've seen, and I think there are

7    probably several more since we filed our briefs in this case,

8    say the SPA is not a document that creates a cause of action

9    for borrowers.  And that stems from the fact that across the

10   nation HAMP does not create a cause of action.  The Home

11   Affordable Modification Program is not -- it is a voluntary

12   process that lenders and loan servicers allow borrowers to go

13   through.  And that voluntary process kind of goes to a lot of

14   claims here, like when we start are taking about duty.

15             THE COURT:  But we have some valid contracts between

16   the parties.

17             MR. THOMPSON:  No question.

18             THE COURT:  Do we have an implied covenant of good

19   faith and fair dealing then?

20             MR. THOMPSON:  We do have an implied covenant of

21   good faith and fair dealing, but it can't --

22             THE COURT:  It attaches to every contract in Utah.

23             MR. THOMPSON:  Absolutely.  But it can't -- you

24   can't use that to rewrite the contract to give someone

25   benefits that the contract doesn't provide, and a loan

1   modification process is exactly that.  There's another --

2   well, getting back to the contract.

3            THE COURT:  What about --

4                       (MULTIPLE SPEAKERS)

5            MR. THOMPSON:  -- performance.

6            THE COURT:  What about communicating truthfully with

7   a contracting party, is that -- is that wound up in the

8   implied covenant of good faith and fair dealing?

9            MR. THOMPSON:  Because it does not relate to any of

10  the contractual rights, which are here is the money, and this

11  is how you're going to repay us, it's something extra

12  contractual.  If they were going to bring up a negligent

13  misrepresentation or fraud claim, we would be arguing the

14  economic loss rule or, you know, something along those lines,

15  but that's not here.

16      On duty, the negligence -- oh, I would also like to just

17  finalize this thing on -- Mr. Morse says there's no admission

18  of default, but the forbearance agreement itself is an

19  admission of default.  It has an admission -- such an

20  admission in the agreement itself.

21      And this failing to apply payments claim, I don't even

22  know what it is.  I mean that -- I can understand if the

23  allegation was we didn't default on this loan.  Well, then, if

24  that was the allegation, then it would be in this complaint,

25  and that's not the allegation.  And I have some of those cases

1    where those are the allegations and that's not here.

2        On duty and negligence --

3            THE COURT:  Can you give me just a moment?

4            MR. THOMPSON:  Yes.

5                        (BRIEF PAUSE)

6            The COURT:   Where do you think in the forbearance

7    agreement there is an acknowledgment that the loan is in

8    default?

9            MR. THOMPSON:  Well, on the first page, my

10   representations --

11           THE COURT:  There's also a paragraph about

12   foreclosure activity, suspending schedule for -- there wasn't

13   a foreclosure sale set though when the forbearance agreement

14   was entered in this case, was there?

15           MR. THOMPSON:  I don't believe so.

16           THE COURT:  But go ahead.  I interrupted you.

17           MR. THOMPSON:  Okay.  Well, do you want me to keep

18   with this or go to --

19           THE COURT:  Was there somewhere else in here?

20           MR. THOMPSON:  Oh, that -- my representations.  I'm

21   unable to afford my mortgage payments and as a result I'm

22   either in default or believe I will be in default under the

23   loan documents and I do not have access to sufficient liquid

24   assets to make the scheduled monthly mortgage payments under

25   my loan documents now or in the near future.

1          THE COURT:  I see that, right, okay.

2          MR. THOMPSON:  Negligence.  There's not a -- there's

3   a number of cases that we cite in our briefs, and again

4   they're kind of old briefs, but not a single one creates any

5   kind of duty that is enforceable under tort law related to the

6   loan modification process.  The Arrow Industries case has been

7   distinguished by several of the courts that have decided this

8   exact question.  And we're talking about a purely voluntary --

9   voluntary decision to review someone for a modification, and

10  that's not the kind of thing that as a matter of public policy

11  should be subject then to a negligence claim or tort duty.

12      The UCC -- the deeds of trusts and mortgages are governed

13  by a very specific section of the Utah Code, section 57, and

14  there are several cases, which I don't get into in my briefs

15  but I could if the Court would like, from this Court saying

16  the UCC is not the applicable law here.

17      So I mean basically we don't have a single case here or

18  in any other jurisdiction that I'm aware of creating a

19  negligence duty on a voluntary loan modification.

20          THE COURT:  What about on the underlying loan

21  agreement?

22          MR. THOMPSON:  What about under the --

23          THE COURT:  Is there a duty flowing vis-a-vis the

24  bank and the lender on the underlying loan agreement?

25          MR. THOMPSON:  There's the duties in the underlying

loan agreement.  I mean -- and then that gets you to the

economic loss rule, which is you can't create a tort duty

based on a contract duty absent personal injury or property

damage.

       If the Court would like to hear a little bit about this

harm element which goes to the contract in negligence if you

get past duty, there was a lot of talk about equity in the

home and title.  And I think the Court was absolutely correct,

none of that relates to -- it has to be causally related to a

breach, and none of it relates to that because -- so we're

talking about ReconTrust, their role, that's -- the Court is

correct, that -- there was an entitlement to foreclose after

the default.  And so whether ReconTrust did it or another

entity, a lawyer, Mr. Matheson, there is no causal link to

harm from any of the allegations in the complaint related to

either negligence or contract.

       On the voidness question, Mr. Morse talks about -- in

some of the briefs he referred to the deranged lunatic on the

courthouse steps purporting to sell properties, but that's not

what this is.  This is a validly and duly substituted trustee.

There is a recorded substitution of trustee appointing them in

that role, which the deed of trust allows the lender to do, or

MERS.

       And just a clarification.  The statute, 57-1-21 I

believe, says that ReconTrust can be a trustee.  The question

1    is whether or not they can exercise the power of sale.

2        On the 1880 case, I think we've argued that as much as we

3    can, but the facts are very different.  It's a very specific

4    provision in the deed of trust.  The specific statutory

5    provisions in section 57 of the Utah Code specifically

6    supersede --

7        THE COURT:  I'm comfortable with the 1880

8    decision.

9        MR. THOMPSON:  All right.  Unless the Court -- I

10   would also mention the Sundquist case that Mr. Morse

11   mentioned.  I'm not sure what the Utah Supreme Court is going

12   to do, obviously, but we would obviously contend that this is

13   a federal question and the Tenth Circuit is the one that needs

14   to decide it because the question is what are the powers

15   granted under the National Banking Act.

16       Unless the court has any questions --

17       THE COURT:  What do you make of Mr. Morse's

18   distinction of RM Lifestyles, if I've said that -- the case

19   names are all blurry now -- but that that case is inapplicable

20   because the trustee may not have been duly authorized but

21   could have been and in this instance could never be?

22       MR. THOMPSON:  Well --

23       THE COURT:  Is that a distinction without merit or

24   is there a substantive element to that?

25       MR. THOMPSON:  I would say that it is a continuation

1    in a long line of cases that depart from this over -- some of

2    the overbroad language in the 1880 case where it says --

3    where, you know, you have a duly authorized and substituted

4    trustee, and the question is what is the harm?  And without

5    harm, without some kind of prejudice to their ability to

6    protect their interests, we don't set aside foreclosure

7    sales.

8           THE COURT:  And it's problematic, isn't it, that

9    language in the 1880 decision because in the instance of

10   foreclosures you also end up with good faith purchasers,

11   you've got other people who rely on the foreclosure, the

12   validity of the sale and the like downstream.  Am I right

13   about that?

14          MR. THOMPSON:  I think that's exactly why the

15   legislature didn't include voidness as a remedy in 57-1-23.5,

16   that, you know, you can -- I'm not saying that if they were

17   correct on the ReconTrust lacks authority argument that you

18   could obtain an injunction against it.  But after it's done,

19   we're not setting it aside unless you meet these very specific

20   and stringent criteria.

21          The COURT:   Is it a different consideration if its

22   the lender who purchases the property on a credit bid?

23          MR. THOMPSON:  Well, I mean I don't think it changes

24   the policy, which is that we need finality when we're dealing

25   with real estate and real estate transactions.  I mean because

1    the lender purchases on a credit bid and then sells, and now

2    you're in the exact same position.  In this case I don't

3    believe -- I mean I know it hasn't because the Kolkows still

4    possess the property.  But that's the reason for the policy.

5           THE COURT:  All right.  Well, thank you.  Thank you,

6    Mr. Thompson.  Thank you, Mr. Morse.   I appreciate very much

7    your briefing, which was very helpful, and the authorities

8    that you've cited there, and your argument today has been also

9    very helpful as well, so I appreciate that.

10      I'm aware, of course, that this motion has been pending a

11   long time, and this case has moved from judge to judge and

12   place to place and it's caused some delays for the Kolkows and

13   for the bank and for that I apologize, but we'll take this

14   matter under advisement and we'll try to get a ruling to you

15   in a timely fashion.

16          MR. MORSE:  Your Honor, I have one other matter, I'm

17   sorry.  I forgot to give you one other case that I prepared.

18   If it would help, I'd like to --

19          THE COURT:  I will read anything you'd like me to

20   consider, if you'd hand a copy of that to our Courtroom

21   Deputy.

22          MR. MORSE:  This is the -- this is just the

23   foreclosure statute I was giving a copy to the Court, and then

24   along with it was Ashby versus Ashby that has a highlighted

25   portion as to how in Utah you determine whether a statutory

1   provision preempts alternative remedies, so I thought that was

2   cogent.

3            THE COURT:  Thank you.  Is there anything else we

4   should address today, counsel?

5            MR. MORSE:  I believe that's it, Your Honor.

6            MR. THOMPSON:  No, sir.

7            The COURT:   All right.  Thank you for your time.

8   We'll be in recess.

9                    (HEARING CONCLUDED AT 5:13 PM)

10                            *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                          Certificate of Reporter

6      I, Raymond P. Fenlon, Official Court Reporter for the

7   United States District Court, District of Utah, do hereby

8   certify that I reported in my official capacity, the

9   proceedings had upon the hearing in the case of Kolkow Vs.

10  Bank of America, et al., case No. 1:11-CV-118, in said

11  court, on the 20th day of December, 2012.

12     I further certify that the foregoing pages constitute

13  the official Transcript of said proceedings as taken from my

14  machine shorthand notes.

15     In witness whereof, I have hereto subscribed my name

16  this 19th day of October, 2015.

17

18

19

20                              /s/ Raymond P. Fenlon

21

22

23

24

25